# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-3516

_____

|  |  |  |
|---|---|---|
| Ann Bogren, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| State of Minnesota; Minnesota | * | |
| Department of Public Safety; | * | |
| Donald Davis, Commissioner of the | * | |
| Department of Public Safety, in his | * | Appeal from the United States |
| official capacity; Minnesota State | * | District Court for the |
| Patrol; Ann Beers, Chief of the State | * | District of Minnesota. |
| Patrol, in her official capacity; | * | |
| Lieutenant Thomas Fraser of the | * | |
| State Patrol, personally and | * | |
| individually; Lieutenant Lori | * | |
| Hodapp of the State Patrol, | * | |
| personally and individually; | * | |
| Lieutenant Colonel Stephen | * | |
| Mengelkoch of the State Patrol, | * | |
| personally and individually, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 16, 2000
Filed: December 22, 2000

_____

Before LOKEN, ROSS, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Ann Bogren, a former probationary trooper with the Minnesota State Patrol, brings this action against the state alleging she was discriminated against on account of her race and gender and retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (1994). She also alleges claims pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 against three state patrol employees in their individual capacities. Upon motions by the defendants, the district court[1] granted summary judgment on Bogren's federal law claims, and she appeals. We affirm.[2]

## I.

Bogren was accepted into the Minnesota State Patrol Academy in November 1994 through a program designed to recruit women and minority applicants into the patrol. Bogren graduated from the academy in February 1995, the first black female to do so. Around the same time, the Minnesota Department of Public Safety launched an investigation into the training environment at the academy. The investigation was spawned by complaints from two former female cadets that academy instructors engaged in sexually harassing and discriminatory conduct. Bogren was interviewed during the investigation but did not identify any incidents where she was harassed or discriminated against.

_____

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota.

[2]Bogren also brought claims against the state pursuant to the Minnesota Human Rights Act (MHRA), Minn. Stat. Ann. §§ 363.01-363.15 (West 1991), and common law negligence claims against all defendants. The district court dismissed the MHRA claim pursuant to the parties' stipulation and declined supplemental jurisdiction of the negligence claims after granting summary judgment on Bogren's federal law claims.

Following her graduation from the academy, Bogren began the patrol's phased field training program. In general, her field training officers (FTOs) provided favorable reports on her performance, but more than one identified her driving skills as an area requiring improvement. Her FTOs commented on her ability to comprehend material quickly and to get along with others, although by the end of her field training period Bogren had developed an antagonistic relationship with her primary FTO, Trooper Brian Polansky. According to Polansky, Bogren's driving performance regressed during the final phase of her field training period. He reported that Bogren committed traffic violations on an almost daily basis, despite his instruction on the necessity of avoiding such violations.

Despite Polansky's concerns over her driving skills, Bogren advanced in May 1995 beyond the field training program, was assigned a patrol car and began solo patrol. As a solo probationary patrol officer, Bogren generally received above average or satisfactory marks from her initial supervising lieutenant, Lieutenant Al Kutz, yet her driving problems continued to be a concern. On May 24, 1995, Bogren struck a metering light with her patrol car, knocking the light over. Another trooper, who happened upon Bogren and the downed metering light, asked Bogren how the light was knocked over. Bogren admitted that she struck the light, but when the officer informed Bogren that she needed to file an accident report with the patrol, Bogren was hesitant and had to be coaxed to make the report. Although Bogren filed the report the same day, the trooper reported to Kutz that she had to convince Bogren to make the report and that Bogren was not happy about it. Kutz later questioned Bogren about the light and specifically asked whether any damage occurred to her patrol car. Bogren denied damage but upon Kutz's inspection he noted that there was some. Bogren was also involved in an incident in August 1995 in which she made a U-turn on an interstate entrance, causing two other vehicles to crash.

On the evening of October 22, 1995, Bogren, while off-duty, went to the home of her former boyfriend, Steve Johnson, to retrieve a set of keys. While in Johnson's

3

home, Bogren attempted to take a set of oriental tea cups she had previously given Johnson, and an argument ensued. During the argument, according to Bogren, Johnson's dog jumped up on her, causing her to drop the cups. She then left, and Johnson called the local police department to report the cup-breaking incident. He also called the patrol office and left a message complaining about Bogren's conduct.

A local police officer responded to Johnson's call. Johnson told the officer that Bogren threw the cups at his feet. The same officer later called Bogren to ask her about the incident. Bogren admitted to the officer that she was at Johnson's home, that an argument occurred, and that cups were broken. The officer informed Bogren that he would be issuing and sending her a citation. In the officer's report of the incident, he noted that Bogren informed him that she threw down the cups, although Bogren denies ever making such an admission. Bogren received a citation for criminal damage to property.

Lieutenant Thomas Fraser, the patrol supervisor on duty the night of the incident, returned Johnson's call around midnight to discuss the complaint against Bogren. He also contacted the local police officer who responded to Johnson's call. The next morning, Fraser relayed Johnson's complaint to his supervisor, Captain Stephen Mengelkoch, who in turn filed a complaint with the patrol's internal affairs division, reporting a charge that Bogren allegedly engaged in conduct unbecoming an officer. The task of investigating the complaint was ultimately assigned to Fraser. Fraser conducted taped interviews with Bogren, Johnson and a female companion of Johnson's who was at Johnson's home on the night of the incident. In his report, Fraser concluded that the charge of conduct unbecoming an officer was sustained. He further reported that Bogren was "untruthful and evasive" during her taped interview with him and that his investigation revealed Bogren had trouble controlling her anger.

Following his investigation of the incident at Johnson's home, Fraser recommended to Captain Mengelkoch that Bogren's employment with the patrol be

4

terminated. Captain Mengelkoch agreed and assigned Lieutenant Lori Hodapp the responsibility of preparing a supervisors' report documenting the reasons for Bogren's termination. The final decision to terminate Bogren was made by Michael Chabries, Chief of the Patrol. Chabries stated in an affidavit that he made the termination decision based on conversations with and reports by Hodapp, Fraser and Mengelkoch. Bogren was notified of the termination decision on November 8, 1995, and was ultimately terminated on November 14, 1995. Shortly thereafter, Bogren pleaded guilty to the reduced charge of petty misdemeanor criminal damage to property.

## II.

We review a district court's issuance of summary judgment de novo, applying the same standards as those employed by the district court. See Callas Enters., Inc. v. Travelers Indem. Co. of Am., 193 F.3d 952, 955 (8th Cir. 1999). Under Fed. R. Civ. P. 56(c), "[s]ummary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 486 (8th Cir. 1998).

### A. Discriminatory Discharge

Bogren advances theories of discriminatory discharge and hostile work environment in support of her Title VII claims against the state. As the district court recognized, her Title VII discriminatory discharge claim is analyzed under the well-recognized McDonnell-Douglas burden-shifting framework. See Roark v. City of Hazen, 189 F.3d 758, 761 (8th Cir. 1999) (citing McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). To survive summary judgment, a plaintiff must first demonstrate a prima facie case of discrimination. See id. A prima facie showing creates a legal presumption of unlawful discrimination and shifts the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. See O'Sullivan v. Minnesota, 191 F.3d 965, 969 (8th Cir. 1999). If the

5

defendant presents a nondiscriminatory reason, "the presumption of discrimination drops from the case" and the burden reverts to the plaintiff to show that the defendant's proffered reason for her termination is pretextual. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Following the Supreme Court's recent decision in Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2108-09 (2000), a plaintiff's prima facie case of discrimination, combined with sufficient evidence from which a reasonable fact finder could disbelieve an employer's nondiscriminatory explanation and make the ultimate fact-finding that illegal discrimination occurred, may form the requisite evidentiary basis upon which to submit to a jury the question of an employer's intentional, unlawful discrimination.[3]

The district court assumed, as we do on appeal, that Bogren set forth sufficient evidence to support a prima facie case of discriminatory discharge. The court concluded, however, that she failed to establish a genuine issue that the state's proffered reason for her termination was a pretext for discrimination. After a thorough review of the record, we agree with the district court and conclude Bogren has not demonstrated that the state's proffered nondiscriminatory reason for her termination is pretextual.

The state meets its burden of advancing a legitimate, nondiscriminatory reason for Bogren's termination from her probationary status. It contends Bogren's termination was triggered by the incident at Johnson's home, but that the decision was based on a

---

[3]Although Reeves involved an Age Discrimination in Employment Act case, the reasoning is equally applicable in the Title VII context, within which the McDonnell-Douglas framework initially arose.

combination of considerations, including: 1) Bogren's conduct at Johnson's home; 2) her poor driving performance; 3) concerns over her accountability; 4) her evasiveness during the investigation of Johnson's complaint; and 5) concern that she might present a disciplinary problem after completion of her probationary period.  We find sufficient evidence in the record to support the state's proffered explanation.  Consequently, any presumption of discrimination "drops out of the picture."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

Bogren therefore bears the burden to produce sufficient evidence from which a reasonable fact finder could conclude that the state's explanation is pretextual.  As proof of pretext, Bogren presents evidence that white male troopers were not treated as harshly when disciplinary or performance issues arose in the past.  While we recognize that instances of disparate treatment may be enough to present a jury question of whether an employer's proffered explanation is pretextual, Bogren must show that these other troopers were "similarly situated [to her] in all relevant respects." Lynn, 160 F.3d at 487.  The district court rejected Bogren's reliance on comparable-trooper evidence because, with the exception of one officer, all of the troopers to whom Bogren compared herself were beyond the probationary period and were thus governed by a collective bargaining agreement.  The court reasoned the collective bargaining agreement, with its attendant grievance procedures, would create a different response by the patrol in disciplining or terminating those officers.

We agree with the premise underlying the district court's conclusion; troopers beyond the probationary period are not similarly situated to a probationary trooper. See Blanding v. Pennsylvania State Police, 12 F.3d 1303, 1309-10 (3d Cir. 1993) (recognizing that tenured troopers are not similarly situated to probationary troopers); see also Ghane v. West, 148 F.3d 979, 982 (8th Cir. 1998) (rejecting comparisons to similarly-situated, nonprotected employees because the comparable employees were not probationary employees and because their conduct did not rise to the same level as the plaintiff's).  Consequently, assuming nonprobationary troopers were treated more

7

favorably than Bogren, we do not find that fact probative of whether the state's explanation is pretextual.[4]

We respectfully disagree with the district court's conclusion that Bogren only compared herself to nonprobationary troopers. On appeal, Bogren presents scant evidence that the patrol did not discipline several white male probationary officers

---

[4]Bogren attempts to show there is little difference between herself and the nonprobationary troopers, asserting that she could only be terminated by the patrol for just cause as specified in Minn. Stat. Ann. § 299D.03 subd. 8 (Supp. 2000). Subdivision 8 provides: "A trooper who has completed six months of continuous employment shall not be suspended, demoted or discharged except for just cause." (Emphasis added). We agree with the district court, however, that Bogren could be terminated without cause because she had not completed her 12-month probationary period, a triggering event for subdivision 8's just cause provision and the attendant termination proceedings identified in § 299D.03.

Our conclusion is based on subdivision 7 of the same statute:

Every person employed and designated as a state trooper under and pursuant to the provisions of this section, after 12 months of continuous employment, shall continue in service and hold the position without demotion, until suspended, demoted, or discharged in the manner hereinafter provided for one or more of the causes specified herein.

(Emphasis added). Bogren was "employed and designated" as a trooper on February 24, 1995. (Appellant's App. at 82). Because Bogren's termination occurred within a year after her designation as a trooper, we read subd. 7 to expressly provide that subd. 8 is inapplicable, and the patrol was therefore entitled to terminate Bogren without reason. Our reading of § 299D.03 is consistent with the state patrol's collective bargaining agreement (CBA). See CBA, Article 15 § 7, Appellees' App. at 120 ("Probationary employees shall not be subject to any arbitration provision of the Agreement nor shall the employee be subject to the provisions of M.S.A. § 299D.03.). We accordingly reject Bogren's assertion that there is little difference between herself and the nonprobationary officers.

when citizen complaints were lodged against the troopers or when disciplinary issues arose. The same probationary officers were also identified in Bogren's response to the state's memorandum in support of summary judgment.[5] The state argues, and we agree, however, that the probationary-trooper evidence offered by Bogren is insufficient to establish pretext. "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (quoting Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988)). Bogren presents no evidence that any of the probationary officers ever received a comparable criminal citation nor that concerns over their accountability, driving performance or tendency to prevaricate were raised during their probationary period. Nor does she show that they were involved in motor vehicle accidents while on patrol. Rather, the record reflects only that two probationary troopers received a single citizen complaint, both of which were investigated and found to be unsustained, and a third received two citizen complaints. Moreover, Bogren has not shown that the supervisor or supervisors responsible for her termination were also involved in the disciplinary action, or lack thereof, of the white male probationary officers. See id. (recognizing that individuals are generally not similarly situated when different decision makers are involved in the respective disciplinary action).

---

[5]Bogren identifies five alleged probationary troopers in her brief to whom she seeks to compare herself. The record evidence upon which Bogren relies does not establish that the five officers were probationary troopers. "[A] party opposing a motion for summary judgment may not rest upon the mere allegations or denials of the pleadings, but by affidavits or as otherwise provided in Rule 56 must set forth specific facts showing that there is a genuine issue for trial." Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999) (quotation omitted). The state concedes, however, that three of the troopers were probationary. (See State's Br. at 19.) For that reason, we consider the state's treatment of those individuals in determining whether summary judgment is appropriate.

Bogren advances other arguments in support of her burden. She argues there is evidence of "blatant lies and inaccuracies" in the supervisors' report recommending her termination. For the most part, the supervisors' report merely presents issues and concerns raised by other troopers during Bogren's probationary period, which are supported by the record, and summarizes the tea-cup incident at Johnson's home. We find no evidence supporting Bogren's assertion that the report contains blatant lies, included by her supervisors to justify her termination, nor any evidence related to the report's preparation which would cause a fact finder to question the explanation offered by the state.

Bogren also contends the fact that she is the only black female trooper (and one of few black troopers) ever employed by the patrol is circumstantial proof of pretext. In essence, she advances simplistic demographic evidence of the patrol's workforce to meet her pretext burden. In Hutson v. McDonnell Douglas Corp., we recognized that statistical evidence "may support a finding of pretext, particularly where there are independent, direct grounds for disbelieving the employer's explanation for discharge." 63 F.3d 771, 778 (8th Cir. 1995) (internal quotations omitted); see also Kim v. Nash Finch Co., 123 F.3d 1046, 1059 (8th Cir. 1997) (in addition to other evidence that the proffered reason was false, pretext was established by evidence that out of 3,500 employees, only 2 management employees in 25 years were nonwhite). The evidence Bogren presents, however, is insufficient to establish a genuine issue of pretext for two reasons. First, there is no independent evidence to support a finding of pretext. Second, we conclude the generic type of employment statistics presented by Bogren are not probative of the reason for her termination. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1319 (10th Cir. 1999) ("[B]ecause overall employment statistics have little bearing on the specific intentions of the employer in making particular hiring decisions, such statistical evidence will rarely suffice to rebut an employer's legitimate, nondiscriminatory reasons for a particular adverse employment action."); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993) ("[S]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's

legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee."); cf. Hutson, 63 F.3d at 777 (statistical evidence is probative of pretext when it analyzes the treatment of comparable employees).

In sum, we conclude Bogren has not presented sufficient evidence from which a reasonable fact finder could disbelieve the state's nondiscriminatory explanation for her termination. Her evidence of pretext is wholly insufficient to create a genuine issue of material fact under Rule 56.

## B. Hostile Work Environment

Bogren's Title VII hostile work environment theory is based primarily on alleged harassing comments made and conduct engaged in by academy instructors during Bogren's academy training. She also advances that she was subjected to a hostile work environment when her supervisors presumed she lied or was evasive during the investigation of the tea-cup incident and when they determined she was not accountable for her actions as a trooper. To establish a Title VII hostile work environment claim, Bogren must establish the following: "(1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take prompt and effective remedial action."[6] Austin v. Minnesota Mining & Mfg. Co., 193 F.3d 992, 994 (8th Cir. 1999). The district court

------

[6]A plaintiff need not show that her employer failed to take remedial action with knowledge of the harassing conduct if the alleged harassers are supervisory employees. See Bradley v. Widnall, No. 00-1046, 2000 WL 1689711, at *3 & n.5 (8th Cir. Nov. 13, 2000). The element requires no further discussion in this case because Bogren failed to present evidence supporting the second element of her hostile work environment claim--that she was subjected to unlawful harassment.

determined that Bogren had not shown any evidence of conduct creating a hostile work environment. We agree.

Bogren's supervisors' conclusions that she was evasive and unaccountable do not, as a matter of law, rise to the level of a hostile work environment. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." (quotation omitted)). As for the environment at the academy, Bogren identifies no instances in which she was subjected to racially or sexually harassing conduct or language, nor does she demonstrate that race or gender played any part in how she was treated by the instructors. When interviewed about the former cadets' complaints, Bogren made a general complaint about cadets being treated inappropriately but stated there were incidents involving both males and females. See Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993) (stating the key issue in a hostile work environment claim "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." (quotation omitted)).

## C. Retaliation

Bogren next claims she was unlawfully terminated from the patrol for complaining to the investigator about harassing and discriminatory conduct at the academy. To establish a prima facie case of Title VII retaliation, Bogren must show: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection between her protected activity and the adverse employment action. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) (en banc), cert. denied, 120 S. Ct. 59 (1999). The district court concluded Bogren's claim fails because she presents no evidence of the first element--that she engaged in activity protected by Title VII.

Title VII prohibits employers from retaliating against employees for engaging in two broad categories of protected activity: 1) opposing any discrimination made unlawful by Title VII or 2) making a charge or participating in any manner in an investigation or proceeding under Title VII. See 42 U.S.C. § 2000e-3(a) (1994). Bogren alleges in her complaint that she opposed activity made unlawful by Title VII, but upon review of the record we find no evidence to support her claim. During the interview, as we previously noted, Bogren identified a limited number of instances in which instructors intimidated cadets, but she explained that the intimidation was directed at both male and female cadets--a complaint unprotected by Title VII. Moreover, as the district court noted, Bogren's answers to the interviewer's questions did not support the claims of harassment made by her fellow cadets. Because Bogren presents no evidence that she opposed discrimination made unlawful by Title VII, we conclude the court properly granted summary judgment on her retaliation claim.

### III.
#### A. Equal Protection

We turn next to Bogren's claims against Lieutenants Fraser and Hodapp, and Captain Mengelkoch in their individual capacities. To begin, she brings a § 1983 claim against the three, asserting they violated her right to equal protection. In general, the Equal Protection Clause requires that state actors treat similarly situated people alike. See Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995). State actors may, however, treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause. See id. Consequently, Bogren must as a threshold matter demonstrate that Fraser, Hodapp and Mengelkoch treated her less favorably than similarly-situated troopers on account of her membership in a protected class. See Keevan v. Smith, 100 F.3d 644, 647-48 (8th Cir. 1996). The district court concluded that Bogren failed to show that similarly situated white and male probationary troopers were treated more favorably, and her equal protection claim fails for that reason. For the same reasons discussed in relation

13

to Bogren's Title VII discriminatory discharge claim, see supra § II.A., we too agree that Bogren fails to present sufficient evidence that she was treated less favorably than other similarly situated troopers.

## B.  § 1981

Bogren also seeks to recover against the individual defendants pursuant to 42 U.S.C. § 1981 (1994).  Section 1981, as amended by the Civil Rights Act of 1991, provides a cause of action for discrimination in the employment relationship.  See 42 U.S.C. 1981(a), (b); see also Richmond v.  Board of Regents of the Univ. of Minn., 957 F.2d 595, 597 (8th Cir.  1992) (recognizing that prior Supreme Court precedent to the contrary, see Patterson v.  McLean Credit Union, 491 U.S. 164 (1989), was superceded by the 1991 amendments).  As an initial matter, Fraser and Hodapp argue Bogren's § 1981 claim fails as a matter of law because she was an at-will employee. Whether an at-will employee may maintain a § 1981 claim is a matter of first impression in this circuit. For those circuits which have addressed the issue, the resounding view is that an at-will employee has a cause of action under § 1981 for discrimination occurring in the employment relationship.  See, e.g., Lauture v. International Bus. Machs. Corp., 216 F.3d 258, 260 (2d Cir.  2000) ("We join the emerging consensus of the district courts in this circuit, and the other circuit courts of appeal that have squarely decided this issue, to hold that an at-will employee may sue under § 1981 for racially discriminatory termination.").  But see Gonzalez v.  Ingersol Milling Mach.  Co., 133 F.3d 1025, 1035 (7th Cir. 1998) (questioning, in dictum, whether an at-will employee has sufficient contractual rights to support a § 1981 claim).

We need not weigh in on the question, however, because even assuming Bogren may maintain a § 1981 claim despite her at-will status, her claim fails on other grounds. As the district court recognized, a plaintiff must demonstrate purposeful discrimination to support a § 1981 claim, see General Bldg. Contractors Ass'n  v.  Pennsylvania, 458

14

U.S. 375, 391 (1982), and thus, the McDonnell-Douglas burden-shifting framework is equally applicable on summary judgment to a § 1981 claim, see Roark, 189 F.3d at 761. Because Bogren cannot meet her burden of demonstrating a genuine issue of pretext, which would give rise first to an inference of, and then be of sufficient strength to support an actual finding of, purposeful discrimination, her § 1981 claim fails.

## C. § 1985

Lastly, Bogren claims the individual defendants conspired in violation of 42 U.S.C. § 1985(3) (1994) to deprive her of her right to equal protection. To prove a constitutional conspiracy, a plaintiff must show that the defendants:

> (1) "conspir[ed] ..." (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." [She] must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

Andrews v. Fowler, 98 F.3d 1069, 1079 (8th Cir. 1996) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)). The showing requires a plaintiff to prove an agreement between the conspirators, which can be satisfied by "pointing to at least some facts which would suggest that appellees reached an understanding to violate her rights." Larson by Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996) (brackets and quotation omitted). As the district court concluded, Bogren's claim fails because she has not shown sufficient facts to support a finding that Hodapp, Fraser or Mengelkoch agreed to violate her right to equal protection.

15

Bogren suggests a fact finder could infer an agreement between the individual defendants to violate her rights based on their hand in preparing the supervisors' report. She claims all three participated in its preparation and that the three included lies and inaccuracies in the report, or adopted the others' lies, to justify her release from the patrol. As we have already said, we do not believe the record supports the allegedly insidious nature of the supervisors' report that Bogren advances nor do we agree that a jury could infer an unlawful agreement merely because the three may have assisted in the report's preparation. Although the point of the report was to justify Bogren's termination, there is no evidence that the three superiors were motivated by Bogren's race or her gender in documenting the events included in the report or in recommending her termination. The record simply does not justify any inference that an agreement was made between the three to deprive Bogren of her right to equal protection.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

16