Ronald **MOWER**, Terry **Klooster**, and Kenneth **Sandy**, Plaintiffs,

v.

E.A. **"Penny" WESTFALL**, Darwin **Chapman**, and **Iowa Department of Public Safety**, Defendants.

No. 4–00–CV–90629.

United States District Court, S.D. Iowa, Central Division.

Dec. 20, 2001.

942

Bruce C. McDonald, Keokuk, IA, for Plaintiffs.

Jeffrey D. Farrell, Assistant Attorney General, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Before the Court is Defendants' Motion for Summary Judgment. Plaintiffs, who are white, have filed six different claims all essentially alleging that they were the subject of reverse discrimination when a black male candidate was promoted instead of one of them. Defendants request summary judgment with respect to all of Plaintiffs' claims. Because the Court finds that Plaintiffs have failed to make out a claim under the *McDonnell Douglas* framework, it grants Defendants' motion in its entirety.

## I. FACTS

The facts in a light most favorable to the Plaintiffs are as follows. Plaintiffs Ronald Mower, Terry Klooster, and Kenneth Sandy are special agents with the Iowa Division of Criminal Investigation ("DCI"). The DCI is a division of the Iowa Department of Public Safety (the "Department"), which is the primary state-wide law enforcement agency in Iowa. Defendant E.A. "Penny" Westfall is the Commissioner of the Department and Defendant Darwin Chapman is the Director of the DCI.

The DCI performs several functions, including criminal investigations, gaming regulation, and law enforcement at licensed riverboat casinos and racetracks. The legislature has made the DCI the primary criminal investigative and enforcement agency for purposes of enforcing gambling laws on riverboat casinos in Iowa. In that regard, the DCI's duties include performing the day-to-day law enforcement at casinos, conducting investigations of regulatory violations at casinos, conducting background investigations on employees of casinos, and conducting major background investigations of prospective new casinos and vendors.

The DCI employs two classifications of officers that work at the casinos: special agent and gaming enforcement officer. There are four gaming enforcement officers assigned to each casino. They are generally assigned to perform the more routine criminal, regulatory, and background investigations. The day-to-day criminal investigations may include investigating and arresting patrons for public intoxication, disorderly conduct, assault, and similar offenses. Regulatory duties

may include monitoring gambling at table games or slot machines to ensure compliance with the regulations established by the Iowa Racing and Gaming Commission ("Gaming Commission"). Background investigations may include running criminal history checks and collecting other information regarding non-executive casino employees to ensure they meet the licensing requirements of the Gaming Commission. Gaming enforcement officers are generally less experienced than special agents, and most new officers in the DCI are hired in the gaming enforcement officer classification.

Along with the four gaming enforcement officers, the DCI assigns two special agents to each casino. Special agents focus on more detailed or complicated aspects of each of the areas described above. For example, a special agent would more likely be assigned to investigate an alleged cheating scam at a casino. A special agent would more likely be assigned allegations of major regulatory violations. Special agents are assigned to perform background investigations of casino companies, large vendors, and top company ownership or management officials.

The DCI then employs four supervisors in charge in the Gaming Unit to supervise the gaming enforcement officers and special agents. They are divided into four regions across the state: northeast, southeast, central, and west. The special agent in charge performs the following duties: (1) make assignments and direct activities of all officers in that zone of the Gaming Unit; (2) coordinate and evaluate all investigative and administrative reports; (3) assist officers in investigative methods and techniques; (4) carry out policies of the Department and DCI; (5) promote public relations and liaison with law enforcement agencies and the public; and (6) submit all administrative reports to headquarters.

In December 1999, the Department demoted the special agent in charge of the southeast region due to violations of rules concerning sexual harassment and unbecoming conduct. The DCI then sent a memorandum on December 28, 1999 to "all eligible officers" informing them of the open position in the Gaming Unit and explaining the application process. The DCI received seven applications for the position: Ben Mims, Ron Mower, Terry Klooster, Ken Sandy, Mike Morris, Rick Rahn, and Ron DeRooi. Of those seven candidates, Mims was the only black candidate, the rest were white.

The Department's promotional process is governed by a written policy. The first section of the policy states: "Promotions will be based on an established process involving point systems for each area of consideration. Whenever practical, vacancies will be filled by the promotion of qualified officers based upon merit examination. The Commissioner will establish guidelines and procedures regarding promotions." The policy goes on to identify five elements of the process: (1) a written examination; (2) an oral board interview; (3) a promotional rating evaluation; (4) seniority; and (5) a veteran's preference. The written examination, which is given only once every two years, tests the promotional candidates' knowledge in five areas: technical police knowledge, legal knowledge, supervisory and managerial knowledge, knowledge of department procedures, and ability to understand and interpret police related text materials. The oral board interview is an interview by the three other members of the Department. The promotional rating evaluation is an evaluation given by the officer's current supervisor. And the seniority and veteran's preference elements consist of giving additional points based on seniority and veteran status. The results of each of these elements are scored, and a pro-

motional eligibility list is compiled based on the scores.

The promotional scores of the seven candidates were as follows:

| Name | Oral Board | Written | Promotobility | Seniority | Veteran's | Total |
|---|---|---|---|---|---|---|
| Rahn | 28.3 | 23.1 | 15.2 | 0.5 | 0 | 66.65 |
| Mower | 34 | 25.5 | 19.4 | 5 | 1 | 84.9 |
| Morris | 28.9 | 24.8 | 16.4 | 5 | 0 | 75.1 |
| DeRooi | 29.4 | 23.1 | 16.6 | 5 | 0 | 74.1 |
| Mims | 26.6 | 19.2 | 15.4 | 5 | 0 | 66.2 |
| Sandy | 31.6 | 24.1 | 13 | 5 | 0 | 73.7 |
| Klooster | 32.5 | 25.5 | 18 | 5 | 0 | 81 |

A company called McCann Associates, Inc., a public management consultant, developed, scored, and evaluated the written exam. They scored the exam based on a maximum score of 100, giving the candidates, who were actually only seven of the forty-eight people who took the exam,[1] the following results: Mower, 73; Klooster, 73; Morris, 71; Sandy, 69; Rahn, 66; DeRooi, 66; and Mims, 55. In their report McCann Associates, Inc. recommended a minimum cutoff score of 68. The promotional policy, however, requires the written exam to be translated into a maximum score of 35.

The Division Director then considers all available data and chooses the top three most qualified officers for the position. The Director must consider the top six scorers on the promotional eligibility list and must consider at least fifteen overall, or as many as have applied if less than fifteen apply. The Director submits the top three names to the Commissioner and the Commissioner selects one officer for promotion.

Exactly what the import of the promotional eligibility list is and how Commissioner Westfall and Director Chapman handled the promotional process is at the heart of the dispute here. Before Chap-

man submitted the names of what he considered to be the top three candidates, Westfall told him to wait. Westfall told Chapman that before submitting his pick of the top three to her, she thought she and Chapman should interview all the candidates. Westfall also submitted written questions to the candidates that required written answers. The candidates were given what Westfall admits was short notice of the interview: All of the candidates were notified on February 4, 2000 that there would be an interview, and during the week of February 7–11 Westfall and Chapman interviewed them. Westfall scored only the first two interviews and stopped scoring during the third, Mim's interview. Chapman, however, scored all seven interviews. His scores were as follows: Mower, 26.5; Klooster, 25.5; Mims, 24; Morris, 23.5; Rahn, 23.5; DeRooi, 21; Sandy, 20.5. In addition to the interviews, Chapman reviewed personnel information, the application forms, the applicants' responses to the written questions, oral board notes, promotional rating evaluations, and discussions with his assistant directors. Chapman testified in his deposition that on February 11, 2000 he and Westfall had a discussion about the promotion during which he orally submitted the names of what he considered to be the

---

1. It must be remembered that the written exam, like all of the elements outlined in written promotional policy, is applied Department-wide and not just to members of the DCI.

three most qualified candidates: Mims, Mower, and Klooster.

Before her discussion with Director Chapman on February 11, Commissioner Westfall also did additional work on the selection aside from the interviews and written questions. During the week of February 7–11, Westfall directed her executive assistant, Captain Donna Bacus, to contact county sheriffs where the seven candidates resided and to contact people in the area of gaming regarding the applicants. Westfall also contacted the Scott County Attorney to inquire about Mims's report writing, because Westfall had received information that Mims had had trouble in the past with writing reports.

Westfall testified that on February 11, 2000 she met with Chapman to discuss the promotion. She testified that she asked for Chapman's three names at the beginning of the meeting and that they discussed the strengths and weaknesses of those three applicants for thirty to forty-five minutes. Later that day, Westfall announced that she had selected Mims. In her daily planner that day, Westfall noted:

> Selected Ben Mims as new SAC for gaming in eastern Iowa. Sent a shock wave across the State. Steve was so upset that he would hardly talk to me. He had wanted Klooster to be selected. He would be good as a SAC in Special Crim (or rather general crim) [sic]
>
> I am confident Mims will do a good job-He is enthused about gaming—is a hard worker and loyal. [sic] All agree he will give the challenge his all.
>
> *　　*　　*　　*　　*　　*

However, both Westfall and Chapman testify that race was never discussed during the selection process.

Between March 7 and March 14, 2000, all three Plaintiffs initiated grievances through the DCI grievance process. They alleged that Westfall and Chapman violated the promotional policy rules in their selection of Mims as special agent in charge. The special agents in charge who handled the first two steps of the grievance proceedings denied the Plaintiffs's claims, stating that they did not have the authority to grant the relief requested. The Plaintiffs appealed to Director Chapman, who also denied their claims. Plaintiffs testified that during the grievance proceedings Chapman told them that the list of three names he submitted to Commissioner Westfall was based on the interviews he conducted with her rather than the entire promotional process. The Plaintiffs then requested further review from Commissioner Westfall. During his grievance meeting with Westfall, Mower told Westfall that Chapman had told them that the three names he gave to her were based solely on the candidates' interviews with himself and her. Westfall replied, at the end of her meeting with Mower, "Other than what you've told me, and Director Chapman's dishonesty, do you have anything else to tell me?" When Mower informed Chapman of this comment, Chapman responded, "Before this is all over, I'll be in the [DCI crime] lab." Chapman's comment was a reference to the job he had before becoming the DCI Director. Both Westfall and Chapman testified that they gave the promotional scores little if any consideration.

After the grievance process was exhausted, Plaintiffs filed complaints with the Iowa Civil Rights Commission which eventually evolved into this action. Plaintiffs allege six claims in this action: (1) a Title VII claim against the Department, Westfall, and Chapman; (2) a § 1981 claim against Westfall and Chapman; (3) a § 1983 claim based on the Equal Protection Clause against Westfall and Chapman; (4) a § 1983 claim based on the Due Process Clause against Westfall and Chapman; (5) a § 1985(3) claim based on the Fourteenth Amendment against Westfall

and Chapman; and (6) an Iowa Civil Rights Act claim against Westfall and Chapman for prospective injunctive relief. Defendants seek summary judgment on all six.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

The Eighth Circuit has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions. *See Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-West Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)).

## III. ANALYSIS

All six of Plaintiffs' claims allege reverse discrimination. And because there is no direct evidence, all six claims must be analyzed under the *McDonnell Douglas* burden-shifting framework. *See McCullough v. Real Foods, Inc.,* 140 F.3d 1123, 1126 (8th Cir.1998); *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 (8th Cir.1993). Therefore, if Plaintiffs fail to make out a claim under *McDonnell Douglas* for one of their counts, all the counts must be dismissed.

## A. Plaintiff's Title VII Claim

 Plaintiffs claim that the Department, Commissioner Westfall, and Director Chapman discriminated against them on the basis of their race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. They claim that Mims was hired instead of one of them because he is black and they are white. Under the *McDonnell Douglas* framework, which both sides used in their briefs to analyze this case, Plaintiffs must first make out a prima facie case of discrimination. *Bogren v. Minnesota,* 236 F.3d 399, 404 (8th Cir.2001) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *O'Sullivan v. Minnesota,* 191 F.3d 965, 969 (8th Cir.1999) (same). This showing creates a presumption of discrimination and shifts the burden of production to the Defendants to articulate a legitimate, nondiscriminatory reason for hiring Mims instead of one of the Plaintiffs. *Id.* If the Defendants articulate such a reason the presumption of discrimination drops from the case and the burden of production shifts back to the Plaintiffs to show that Defendants' reason was not the true reason for why they did what they did, but rather a pretext for discrimination. *Id.* " 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Bogren,* 236 F.3d at 404 quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1. Prima Facie Case

 Ordinarily, a plaintiff alleging race discrimination must prove the following elements in order to make out a prima facie case of discrimination: (1) that he belonged to a protected class, (2) that he met the minimum qualifications and applied for the position, (3) that despite his qualifications he was denied the position, and (4) that his employer promoted a person of similar qualifications who was not a member of the protected group. *Dotson v. Delta Consolidated Industries, Inc.,* 251 F.3d 780, 781 (8th Cir.2001); *McCullough v. Real Foods, Inc.,* 140 F.3d 1123, 1126 (8th Cir.1998). There is no dispute that Plaintiffs have demonstrated these four elements. But the Eighth Circuit, along with many other circuits, has held that this showing is not enough to create a presumption of discrimination when it comes to reverse discrimination. *Parker v. Baltimore and Ohio Railroad Co.,* 652 F.2d 1012, 1017–18 (D.C.Cir.1981); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985); *Duffy v. Wolle,* 123 F.3d 1026, 1036 (8th Cir.1997); *Mills v. Health Care Service Corp.,* 171 F.3d 450, 455–57 (7th Cir.1999). Rather, in a reverse discrimination case the plaintiff must also show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Duffy,* 123 F.3d at 1036.

The reason that something different is required of reverse discrimination plaintiffs goes back to the purpose of Title VII and the function of the *McDonnell Douglas* burden-shifting framework. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court described the purpose of Title VII as follows: "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." White citizens, however, have not historically been subjected to those same kind of discriminatory practices and devices, which the *McDonnell Douglas* burden-shifting framework was

designed to flush out. As Judge Abner Mikva of the D.C. Court of Appeals so aptly explained:

> The original McDonnell Douglas standard required the plaintiff to show 'that he belongs to a racial minority.' Membership in a socially disfavored group was the assumption on which the entire McDonnell Douglas analysis was predicated, for only in that context can it be stated as a general rule that the 'light of common experience' would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.

*Parker v. Baltimore and Ohio Railroad Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981). *See also Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63 (6th Cir.1985) (explaining that the premise underlying the varied *McDonnell Douglas* standards "stems from Congressional efforts to address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect."). In other words, it only makes sense to handle reverse discrimination cases differently in order to adequately flush out whether any discrimination did in fact occur.

To be clear, whether a white plaintiff's prima facie case is characterized as requiring something more or just something different is essentially a matter of semantics. As noted by Judge Mikva in *Parker,* *McDonnell Douglas* describes the first element of a prima facie case as showing "that he belongs to a racial minority." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In 1976, however, three years

after *McDonnell Douglas,* the Supreme Court held that whites were also protected as a class under Title VII. *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Since then, some courts have gone to simply describing the first element as membership in a protected class. *See, e.g., Duffy,* 123 F.3d at 1036. This, of course, changes the import of the prima facie case though. It seemingly would allow a white male plaintiff to make out a prima facie case with a showing similar to that of a non-white male plaintiff. Yet, as explained above, that is not the case, nor would it be appropriate. Some courts, on the other hand, still describe the first element as membership in a minority group. *See, e.g., Harding v. Gray,* 9 F.3d 150, 152 (D.C.Cir. 1993); *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 454 (7th Cir.1999). Those courts are therefore able to simply characterize the "background circumstances" showing as a substitute for the first element. *Harding,* 9 F.3d at 153; *Mills,* 171 F.3d at 455–57. Regardless of the description, the burden among the circuits adopting the "background circumstances" approach to reverse discrimination is basically the same.

Exactly what is required of Plaintiffs in terms of an additional showing, or "background circumstances," is difficult to articulate. The only Eighth Circuit case to deal with the requirement, *Duffy v. Wolle,* 123 F.3d 1026 (8th Cir.1997), provides little guidance. In that case, the court simply stated that the plaintiff sustained his burden of showing "background circumstances" that his employer, a panel of judges here in the Southern District of Iowa, was the unusual employer who discriminates against men by showing: (1) that he was substantially more qualified than the woman who received the job; (2) the chief judge of the panel had mentioned an interest by someone in the Administra-

tive Office of the United States Courts in the recruitment of a female; and (3) that two of the judges on the panel had usually hired female law clerks. *Id.* at 1037.

Fortunately, other circuits have dealt more fully with the "background circumstances" requirement. The D.C. Court of Appeals seems to have dealt with the issue of reverse discrimination the most and accordingly provides the most help. In *Harding v. Gray,* 9 F.3d 150 (D.C.Cir.1993), the court states that the evidence it has found to constitute "background circumstances" can basically be divided into two categories: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites ... and (2) evidence indicating that there is something "fishy" about the facts of the case at hand that raises an inference of discrimination." (citations omitted). One of the examples the court cites for the second category of evidence, *Bishopp v. District of Columbia,* 788 F.2d 781 (D.C.Cir.1986), involved a promotee who was less qualified than four white plaintiffs and yet was promoted "'over the[ir] heads ... in an unprecedented fashion.'" *Harding,* 9 F.3d at 153 (citing *Bishopp,* 788 F.2d at 786–87). The Court finds the evidence Plaintiffs have proffered to fit within this second category.

As difficult as the "background circumstances" requirement is to articulate, it is even harder to apply. Plaintiffs, like the Plaintiffs in this case do, often submit the same evidence to show both background circumstances and pretext. In *Duffy,* the Eighth Circuit did not seem to apply much scrutiny to the plaintiff's prima facie offering though; instead, the court waited to scrutinize plaintiff's evidence at the pretext stage, where it then discredited it. 123 F.3d at 1037–40. However, other courts seem to be applying more scrutiny to the Plaintiff's prima facie showing before going on to the pretext stage. *See, e.g., Harding v. Gray,* 9 F.3d 150, 153–54 (D.C.Cir.1993); *Murphy v. Milwaukee Area Technical College,* 976 F.Supp. 1212, 1217–18 (E.D.Wis.1997). This Court will go ahead and analyze Plaintiffs' evidence first in light of Defendants' scrutiny of it-but absent Defendants' explanation of the actual decision-and then analyze Plaintiffs' evidence in light of Defendants' explanation for the decision, as part of the pretext analysis.[2]

■ Absent Defendants' explanation for why they did what they did, Plaintiffs' evidence is enough to raise an inference of discrimination. Plaintiffs' evidence can be broken up into four relevant pieces. First, there is Mims's performance on the elements of the promotional process that are outlined in the written policy. There is no dispute that Mims scored last on both the written exam and the oral board interview, and that he scored last overall. Defendants' explanation for this is that they simply did not take those scores into account.

This leads the Court to Plaintiffs' second piece of evidence, Plaintiffs' allegation that

2. In *Duffy,* the Eighth Circuit notes that "'[j]ust because a reverse discrimination claimant cannot show the background circumstances necessary to trigger the *McDonnell Douglas* presumption does not inexorably mean that his employer has not intentionally discriminated against him.... An employee who is the victim of intentional discrimination in such circumstances, and who adduces sufficient evidence of that discrimination, should be permitted to proceed beyond the prima facie case stage of litigation.'" 123 F.3d at 1036 (quoting *Notari v. Denver Water Dep't,* 971 F.2d 585, 590 (10th Cir.1992)). The availability of such an avenue is irrelevant, however, because the Plaintiffs here have chosen to take advantage of the *McDonnell Douglas* framework and have thus styled their evidence in that format.

Defendants deviated from Department policy by conducting an extra interview and submitting questions to the candidates. Plaintiffs state that the written promotion policy requires the Commissioner to establish guidelines and procedures for the promotion selection. They note that neither the interview with Commissioner Westfall and Director Chapman nor the questions submitted by Commissioner Westfall were outlined beforehand. Further, Plaintiffs note that at the time Iowa Code § 19A.9(7) (1999) mandated "[f]or the appointment by the appointing authority of a person standing among the highest six scores on the appropriate eligible list to fill vacancy." The Department's written policy, however, which was last amended before the promotion at issue in 1997, does not require such. This is so even though § 19A.9(7) was the same in 1997.[3] Instead, the Department's policy only requires that the top six scorers be considered. While this apparent inconsistency remains unexplained by the Defendants, it cannot be given any weight here. That is because the Department policy was in place prior to Commissioner Westfall's arrival, and the issue is more properly centered around whether Commissioner Westfall followed the Department policy.

Plaintiffs also state that Commissioner Westfall's and Director Chapman's failure to take the promotional scores into account was abnormal. Both Commissioner Westfall and Director Chapman essentially concede that the promotional scores were given little, if any, weight. They explain that the promotion scores are for the most part used to create the eligibility list, in so far as they must pick at least fifteen candidates to consider and must consider the top six scorers. Yet Plaintiffs allege that both Westfall and Chapman considered the scores in the past when making promotion selections. The record does not complete-

ly bear out that allegation though. Director Chapman did testify at his deposition that in the past he had considered the test scores in making his determination. However, Director Chapman stated that it was not his practice to simply tally up the scores and submit the top three scorers. It must also be remembered that Director Chapman's role is to assist Commissioner Westfall in her selection, and that this was Commissioner Westfall's first selection in the DCI.

Commissioner Westfall explains that the reason she conducted an extra interview was to help her select the best person for the job. She testified that she thought she would have an opportunity to promote many persons very rapidly over the next few years and that it was important she get to know them. Westfall testified that it was her practice to interview all the candidates. In fact, Director Chapman and Special Agent in Charge Steve Conlon testified that Commissioner Westfall told them at the start of the entire promotion process that she was going to interview all the candidates. Defendants also note that the State Patrol, another division of the Department and also bound by the same promotion policy, considers supervisory candidates in the same manner as Chapman and Westfall did here. The only evidence Plaintiffs have to refute this is their own hearsay testimony that they believe she interviewed just the top three scorers in another, similar promotion.

Third, Plaintiffs allege Commissioner Westfall gave special attention to Mims in her investigation of the candidates. Plaintiffs claim that Westfall had her assistant, Captain Baucus, contact county sheriffs and gaming enforcement officers only with regard to Mims. Again, the record does not completely bear out this allegation. Baucus's memoranda reporting the prod-

---

**3.** The Iowa Code is published every two years.

uct of those two tasks clearly indicate that Baucus was interested in finding information about all the candidates. In fact, the memoranda were just as favorable, if not more so, toward Plaintiff Sandy as they were toward Mims.

Plaintiffs also note that Commissioner Westfall contacted the Scott County Attorney specifically regarding Mims. Westfall states that she did this because she had received information that Mims had trouble with report writing and wanted to check with the Scott County Attorney to see if there was still a problem. The Scott County Attorney had no complaints.

Fourth, Plaintiffs point to Commissioner Westfall's and Director Chapman's comments as evidence of discrimination. The Court finds these comments of questionable value. Viewing Westfall's comment in its entirety, the context seems to have as much or more to do with people being upset because their individual favorite candidate was not selected than with people being upset because the person who did get the job got it because he was black. Chapman's comment is even harder to understand. In essence, it appears to be an acknowledgment that Westfall was upset with him. But the inference of discrimination is extremely difficult to draw. For Plaintiffs are alleging that, at least in part, Chapman and Westfall acted together to discriminate against them. Moreover, neither comment has anything specifically to do with race. Therefore, giving every possible inference to the Plaintiffs, as the Court is required to do, the Court finds that these comments could raise suspicion; suspicion about what is difficult to say though.

Despite the limited value of some of this evidence, the Court finds that the Plaintiffs have still produced sufficient evidence to raise an inference of discrimination. While the Defendants can shoot holes in or explain away much of the evidence, ques-

tions still abound from that which remains. The Court notes, however, that the evidence is weak and is only sufficient in the sense that no logical explanation for the ultimate decision is considered with it.

### 2. Pretext

█ The Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether the real reason for Defendants' decision to hire Mims was discrimination. Defendants' reason for hiring Mims is that he was the best person for the job. Plaintiffs counter with essentially the same evidence they offered to show background circumstances.

The Defendants offer a variety of reasons why Mims was hired. Commissioner Westfall states that she promoted Mims because of his experience in gaming, his interest in gaming, the initiative he had shown on gaming issues, his efforts to improve himself, and his unquestioned integrity. Westfall points out that Mims had ten years of experience in the gaming area, more than any other candidate. Westfall also states that during the interview with her and Chapman, she asked them about the problems and needs of the DCI. She states that while other candidates spoke about general criminal investigations, general training, and the crime laboratory, Mims focused on issues in gaming.

Westfall also gives several examples of how Mims took the initiative on gaming issues. Mims took it upon himself to go out to the local county attorneys and sheriffs to teach them about gaming issues and increase the respect for DCI's Gaming Unit. He took it upon himself to write a memorandum for the local jail to assist with booking on gaming charges. Finally, Mims initiated a surveillance project that served as the standard for DCI's surveillance of casino operations in Iowa. In addi-

tion, Westfall notes that Mims read books and materials on management issues and was very "clear-cut" on integrity issues. And she notes that the reports she received indicated that Mims would develop good relationships with other agencies and the casino industry.

Director Chapman had the same impression of Mims. Chapman's impression was based on his interview with Mims, his personal knowledge of Mims, and a review of written materials, such as writing samples, applications, and personnel files. After reviewing all of this, Chapman echoed the reasons given by Westfall.

The Defendants also give reasons why the Plaintiffs were not hired. Klooster's credentials were very similar to those of Mims. However, Westfall states that she hired Mims over Klooster because Mims had more experience in gaming, as well as the other reasons stated above. Westfall gives three reasons why she specifically did not hire Mower. First, she had received reports that Mower was inflexible, which she claims were confirmed in her interview with him. Second, she states that Mower only had three years experience in gaming, and none since 1992. Third, she states that she questioned Mower's ability to lead gaming enforcement officers, because at one point at least he had wanted to eliminate them. Lastly, with respect to Sandy, Westfall states that he had never been formally assigned to the Gaming Unit, so his experience was minimal, and that his organizational skills were weak.

In light of Plaintiffs' explanations, Defendants' evidence falls short. In *Duffy*, the Eighth Circuit stated the following with respect to a court's review of the factors that constitute the best qualified candidate:

> Evidence that an employer hired a less qualified candidate for a position can support a finding that the employer's

nondiscriminatory reason for the hiring was pretextual.... Identifying those strengths that constitute the best qualified applicant is, however, a role best left to employers; as we have often noted, *"the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."*

123 F.3d at 1037–38 (citations omitted) (emphasis added) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995)). After stating this, the court went on to hold that the panel's preference for experience in one area over experience in another area could not be interpreted as pretextual. *Id.* at 1038.

Similar cases have failed to raise a genuine issue of material fact. In *Simms v. Oklahoma*, 165 F.3d 1321, 1329 (10th Cir. 1999), the plaintiff's evidence included such "procedural irregularities" as the decision to have a second round of interviews, testimony that the candidate with the highest first-round score was often selected for the job, and a top-level executive sitting in on the second round interview panel. In affirming summary judgment, the court stated that the fact that the top-level executive sat in on the interviews only made sense, because he retained ultimate hiring discretion for the position. *Id.* And in *Denney v. City of Albany*, 247 F.3d 1172, 1187–88 (11th Cir.2001), the court rejected a plaintiff's claim that rested on the fact that the objective phases of the hiring process were used only to create a pool of qualified candidates.

The case of *Bishopp v. District of Columbia*, 788 F.2d 781, 786–87 (D.C.Cir. 1986), where a promotee who was less qualified than four white plaintiffs and yet

was promoted "over the[ir] heads ... in an unprecedented fashion," stands in contrast. Plaintiffs have not demonstrated that they were more qualified than Mims, only that they scored better on the objective phases of the process. Nor have the Plaintiffs necessarily proven that they were hired in an unprecedented fashion. Moreover, in *Bishopp* there was evidence of an affirmative action plan and political pressure. *Id.* at 787.

At bottom, Plaintiffs lack evidence tying Defendants' alleged deviation from Department policy to discrimination. While a reasonable jury could believe that the Defendants deviated from some prior policy, there is nothing in the record to allow a reasonable juror to find that the deviation was the result of discrimination. In fact, out of the fifty-one supervisory promotions Commissioner Westfall has made Mims is the only black candidate who has been promoted. Plaintiffs fail to make out a case under the *McDonnell Douglas* framework, and their Title VII claim must therefore be dismissed.

### B. Plaintiff's Other Claims

 Plaintiffs also sue Defendants under 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and the Iowa Civil Rights Act, Iowa Code § 216, et seq. All of these claims involve intentional discrimination. Plaintiffs must therefore be able to make out a claim under the *McDonnell Douglas* framework for these counts as well. *See Chambers v. Wynne School Dist.*, 909 F.2d 1214, 1216–17 (8th Cir. 1990) (holding the *McDonnell Douglas* framework applies to claims under §§ 1981 and 1983); *Peguese v. Borup*, 129

F.Supp.2d 1048, 1051 (holding the *McDonnell Douglas* framework applies to claims under § 1985);[4] *Helfter v. United Parcel Serv.*, 115 F.3d 613, 616 (8th Cir.1997) (holding the *McDonnell Douglas* framework applies to claims under the Iowa Civil Rights Act). Because Plaintiffs cannot do that, the rest of the counts in their Complaint must also be dismissed.

### IV. CONCLUSION

Defendant's Motion for Summary Judgment is granted on all counts. The case is dismissed.

**IT IS SO ORDERED.**

---

4. The Court is unaware of an Eighth Circuit case applying the *McDonnell Douglas* framework to claim under § 1985. However, the Court presumes that the Eighth Circuit would hold that the inability to prove intentional discrimination under the *McDonnell Douglas* framework would be fatal to a § 1985 claim. In the event that the Eighth Circuit would not hold as much, the Court notes that it explicitly finds the absence of a conspiracy to deprive Plaintiffs of their right to equal protection under the laws. *See Bogren v. Minnesota,* 236 F.3d 399, 409 (8th Cir.2000) (setting forth the elements of a 1985(3) claim).