Nicole K. SMITH, Plaintiff,

v.

EATON CORPORATION, Defendant.

No. C00–3087–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 1, 2002.

Jean M Baker, Hopkins & Huebner, Des Moines, IA, for Nicole K Smith, plaintiffs.

Maurice B Nieland, Rebecca A Nelson, Rawlings Neiland Probasco, Killinger Ellwanger Jacobs, et al, Sioux City, IA, F Daniel Balmert, pro hac vice, Ellen Toth, pro hac vice, Cleveland, OH, for Eaton Corporation, defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* .......................................................1082
 A. *Procedural Background* ...............................................1082
 B. *Factual Background* .................................................1082

II. *LEGAL ANALYSIS* .....................................................1089
 A. *Standards For Summary Judgment* .....................................1089
 1. *Requirements of Rule 56* ..........................................1089
 2. *The parties' burdens* ..............................................1090
 3. *Summary judgment in employment discrimination cases* ..............1090
 B. *Claims of Sexual Discrimination* .......................................1092
 1. *Disparate treatment claim* ........................................1092
 2. *Hostile work environment claim* ...................................1095
 C. *Retaliation Claim* ..................................................1097

III. *CONCLUSION* ........................................................1099

### I. INTRODUCTION

#### A. Procedural Background

On September 20, 2000, plaintiff Nicole E. Smith filed this sex discrimination lawsuit in the Iowa District Court In And For Wright County against her former employer, Eaton Corporation ("Eaton"). Plaintiff Smith was employed at Eaton's plant in

Belmond, Iowa. Defendant Eaton removed this case to this court on October 26, 2000, pursuant to 28 U.S.C. § 1441. On April 12, 2001, plaintiff Smith filed an amended complaint. Smith alleges in her amended complaint that she was subjected to sexual harassment and discrimination during her employment with Eaton and that her employment was terminated in retaliation for her complaining about harassing conduct of her co-workers. Specifically, Smith alleges that she was discriminated against on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Iowa Civil Rights Act (ICRA), IOWA CODE Ch. 216. She further contends that she was subjected to sexual discrimination in the form of a hostile work environment, in violation of Title VII and the ICRA. Finally, Smith alleges that she was fired after she reported sexual harassment in retaliation, in violation of Title VII and the ICRA. Eaton answered Smith's amended complaint on July 31, 2001, denying all of these claims.

On October 5, 2001, Eaton filed a motion for summary judgment. In its motion, Eaton asserts that Smith cannot establish a *prima facie* case of sex discrimination. Eaton further asserts that even if Smith is able to make out a *prima facie* case of sex discrimination, Eaton has demonstrated a non-discriminatory reason for her discharge and Smith has failed to offer admissible evidence that Eaton's reason for her dismissal is pretexual. Eaton also asserts that Smith's factual allegations of harassment, even if true, do not constitute a sexually hostile work environment. Finally, Eaton also contends that Smith was not terminated for complaining about sexual harassment. Smith filed a timely resistance to Eaton's motion on October 22, 2001, in which she disputes Eaton's arguments. Eaton filed a reply to Smith's resistance on October 29, 2001. Before discussing the standards for Eaton's Mo-

tion for Summary Judgment, however, the court will first examine the factual background of this case.

The court heard oral arguments on defendant Eaton's motion for summary judgment on January 29, 2002. At the oral arguments, plaintiff Smith was represented by counsel Jean Baker of the Baker Law Office, West Des Moines, Iowa. Defendant Eaton was represented by counsel Ellen Toth of Vorys, Sater, Seymour and Pease, L.L.P., Cleveland, Ohio. The parties have filed thorough briefs in support of their respective positions. The oral arguments were very informative and cogently presented.

### B. Factual Background

The following facts are either undisputed or viewed in the light most favorable to plaintiff Smith as the nonmoving party. Plaintiff Nicole E. Smith began working for Eaton as a "weekend warrior" on June 27, 1994, at Eaton's Belmond, Iowa plant. Smith worked as a visual and pack employee on a valve production line. In this position, Smith was responsible for visually inspecting and packaging the valves produced on the assembly line. On April 1, 1997, Smith became a full-time employee of Eaton, working as a visual and pack employee on the second shift of the 800 line. In November 1997, Smith was trained as auditor to fill in for an employee who was taking a leave of absence. At Eaton, an auditor shares the same job duties as a visual and pack employee but has additional responsibility for quality control. On the production and inspection line, an auditor inspects the valves and communicates potential problems to the machine operators or other team members. As a result, the auditor is responsible for detecting and correcting production defects in the valves and communicating these problems to the other team mem-

bers. Among the duties detailed in the job description for Smith's position were:

B. Consults with audit and line personnel to identify quality problems.

C. Provides audit personnel with samples.

. . . . .

E. Visually inspect parts for quality defects and removes defective parts from the process. May stop and correct the process to meet product quality requirements.

. . . . .

M. Actively participates as a functioning team member of a self managed work team.

Job Description at 1, Defendant's Ex. 3, App. 39.

During the time of Smith's employment with Eaton, Eaton's Belmond plant was run by self managed work teams of employees. Eaton used "plant management guides" in order to realize the goal of teamwork. Eaton also had in place an Equal Employment Opportunity Policy and a Harassment Free Workplace Policy.

As a visual and pack auditor, it was part of Smith's job duties to assist the packing employees and prevent the valves from piling up at the end of the line. All team members, including auditors, are required to cover for employees who are taking breaks. Smith objected to management's requests that she relieve other employees who were on break.

During Smith's employment with Eaton, Eaton received multiple complaints from her managers and co-workers regarding Smith's workplace performance and activities. Eaton's management counseled Smith about the complaints lodged against her. On October 13, 1997, after receiving complaints from workers on Smith's line that she was spreading rumors about personnel on that line, John T. Swisher, shift superintendent, counseled Smith about her actions:

I brought Niki into my office and told her that this type of behavior was childish (the type of behavior I would expect from someone in high school) and that it needed to stop. It was detrimental to the team and would only cause further hard feelings. Niki asked if I thought she was childish (acting like a high school girl). I didn't respond and I believe I had made my point.

Internal Correspondence at 1, Defendant's Ex. 1–Y, App. 35. On October 20, 1997, Kellie Howieson, a third shift employee, informed John Swisher that Smith had approached her on October 18, 1997, to gossip about Tim Smith, Smith's former boyfriend, and Vanessa Spencer, Tim Smith's current girlfriend. On October 21, 1997, John Swisher again counseled Smith about her gossiping actions:

Counseling sessions were held individually concerning the gossip ring that had developed between Ellen, Mary, Barb, and Niki. I advised all four associates that I would no longer tolerate this kind of behavior and that it was having an extremely negative effect on the 800–line team. I also advised all four associates that this gossiping and rumor spreading was a violation of the plant's harassment free workplace policy, and that if it continued that a more severe course of disciplinary action would be pursued (up to and including termination).

Internal Correspondence at 1, Defendant's Ex. 1–W, App. 33.

Over the course of the next several months, a number of meetings were held between Smith and her Eaton supervisors in order to address both Smith's concerns and to improve Smith's work performance. On February 20, 1998, Michael Bush, Eaton's Human Resources Manager, met

with Smith at her request. At this meeting, Smith complained, *inter alia,* about Darren Peil, a team facilitator, instructing her to keep valves packed in boxes, his permitting Tim Smith and Vanessa Spencer to take their breaks at the same time and then requiring her to cover for them while on break, and her belief that Peil disliked her because she was Asian–American. On February 23, 1998, Bush met with Peil and Smith to address Smith's complaints about the activities on the production line and her concerns that Peil held racial animosity toward Smith. Peil denied harboring racial animosity toward Smith because she was Asian–American and explained that because they were short staffed at the time everyone needed to cover each other to keep the line moving smoothly. Peil and Bush explained to Smith that packing valves and keeping the conveyor area from getting piled up were part of the job of a visual and pack auditor.

On March 24, 1998, Linda Tweeten, a visual and pack female co-worker, complained to Swisher about Smith's negative attitude and her unwillingness to pack valves and cover breaks of other workers. On March 25, 1998, Swisher contacted Michelle Larson, a human resources supervisor, to discuss what to do about Smith's negative attitude and her unwillingness to perform certain job duties. They decided to hold a formal counseling session with Smith. On March 26, 1998, Swisher and Larson conducted a formal counseling session with Smith. Swisher and Larson explained their expectations to Smith:

> We fully expect that the negative criticisms about other associates in the plant will cease immediately. We expect Nikki to be a team player and to visually inspect parts (since she is certified), or pack valves should the team require it since these functions fall under her job classification as visual inspector. It makes good business sense to utilize her skills in these areas when the need

arises. Her failure to exhibit the team spirit and avoiding those duties is having a negative impact on her co-workers. These negative behaviors will cease immediately or further documented counseling sessions will follow.

Internal Correspondence at 1, Defendant's Ex. 1–Q, App. 25.

On April 30, 1998, Smith was given an unsatisfactory rating in her performance review in the "cooperation and team work" category. The comments for that section provide:

> There are times when Nikki has a problem working with people in her immediate working area on 800 line V & P. In the past year this has been an issue. I believe that these issues are behind us now & see no reason why Nikki would not be rated as competent on her next review barring any future problems.

Performance Review at 5, App. 148. She received "competent" ratings in all other categories on her performance review.

On June 28, 1998, Smith complained to Peil that Eaton needed to get better qualified personnel on the 810 line so that things would run better and that she had been forced to pack valves almost the entire night because the visual and pack end was short of help. Peil documented the discussion in a note to Smith's personnel file. Peil noted his disbelief about Smith's comment about her being forced to pack valves the entire shift and his view of Smith's unwillingness to perform certain duties:

> Nikki told me that she was having to pack almost the whole night because the Visual and Pack end was short of help. This was not true because I was around the area several times earlier in the evening and never saw her packing until she paged me to talk to her about this issue. I also asked one of here [sic] teammates how long Nikki had been

packing and they responded "maybe five minutes."

This is another example of the problem Nikki has as far as working with a team and being a team player. Instances have come up in the past where she has been asked to perform duties within her job classification and job description and has complained about having to do them.

Internal Correspondence at 1, Defendant's Ex. 1–P, App. 24.

On July 10, 1998, Peil talked to Smith about, *inter alia*, not following procedure when rejecting parts for a quality problem and her need to keep up with her audits. On July 30, 1998, Peil sent a memorandum to Bush about complaints he had received from Linda Tweeten, a co-worker of Smith's, that Smith was short tempered and very emotional with her co-workers when she was working overtime hours. As a result, Smith's overtime was limited to not more than one 12 hour day a week.

On August 19, 1998, Smith met with Neal Tendall, the plant superintendent, to discuss things that were bothering Smith at work. Smith told Tendall that she viewed the issue as being "a hostile work environment." Internal Correspondence at 1, Defendant's Ex. 1–M, App. 19. Smith identified the following items that were bothering her:

* She said that Stephanie Spencer complained to Team Facilitator Darin Peil that Nikki spends to much time talking to her mother (Karen Smith).

* She complained that there was a note in the P.L.C. office that Darin didn't give to her or communicate to her (Nikki found the note).

* She stated that when the 830 line and batch ran production on the 810 line, she had to audit both the 800 and 810 line and no one said "thank you".

* She stated that Tim Smith doesn't always where [sic] his safety glasses.

* She also said that Tim [S]mith doesn't always relieve the visual and pack area for breaks.

* She complained that Tim Smith and Vanessa Spencer take break together and she has to cover Vanessa's break.

* Nikki said she had written in the audit book that Tim Smith and Vanessa Smith had taken to long of a break and someone had "whited out" the comment.

* She said someone complained that Nikki doesn't always use the vacuum lift when doing audit.

* She said that on one occasion she didn't communicate to Tim that there was a seat run out rejection but Darin didn't communicate to him either.

* She said that Darin told the operators that the "girls were fighting."

Internal Correspondence at 1, Defendant's Ex. 1–P, App. 24. At this meeting, after listening to Smith's complaints, Tendall asked Smith if she would like to move to a different part of the plant. Smith declined Tendall's offer. Tendall then asked Smith if he should transfer Tim Smith, Vanessa Spencer, Stephanie Spencer, or Darin Peil. Smith responded by telling Tendall that she didn't want to see anyone moved but wanted Peil to communicate with her more.

On August 21, 1998, Swisher and Tendall met to review the ongoing issues with Smith and attempt to resolve them. While agreeing that Peil had been doing everything possible to work with Smith, Swisher and Tendall decided to make a change in personnel. A change would allow Peil to gain experience in a new section of the plant and allow Jodi Braun, a female manager who got along well with Smith, to take over as Smith's supervisor.

On December 9, 1998, Swisher received a report from Dan Roberts, a machine operator, about an argument Smith had in

the workplace with Merle Robbins. Roberts reported that:

[T]he argument was about how and where pallets of valves were to be stacked in the chrome plate out-going audit area. He stated that Niki had deliberately left a pallet of valves behind the fork truck that Merle had been using to load trucks. Merle asked Niki not to leave pallets behind the fork truck again. Niki responded by telling Merle to get his "fat ass off the fork truck and move it himself" and then walked away.

Internal Correspondence at 1, Defendant's Ex. 1–K, App. 17.

On January 14, 1999, Jodi Braun held a counseling meeting with 800 line members Linda Tweeten, Mary Ellen Nelson, Ellen Countryman and Smith with regard to a report she had received that Smith and Countryman were telling other line members false information about Nelson, including derogatory remarks about Nelson's job performance. On February 4, 1999, Jodi Braun, Erin Schrek, a human resources generalist, and Tom Swisher, the supervisor of second shift, held a formal counseling meeting with 800 line members Linda Tweeten, Mary Ellen Nelson, Ellen Countryman and Smith with regard to complaints Braun had received that Smith and Countryman were continuing to tell other line members false information about Nelson, including derogatory remarks about Nelson's job performance. Swisher told Nelson and Smith that they had received prior counseling about spreading rumors about others and that it had to stop.

In February 1999, two of Smith's coworkers nominated her for the "In the Spotlight" award. Smith received the award which was based on her willingness to help her team. On March 1, 1999, Jodi Braun had an informal meeting with Smith to discuss complaints Braun had received from several of Smith's co-workers, including Stephanie Spencer, Linda Tweeten, Mary Ellen Nelson, Tim Smith, and Jeff Eivins, about Smith's attitude and rude behavior as well as Smith's failure to adequately communicate with her co-workers about quality control issues. On March 19, 1999, Jodi Braun received complaints from six employees, Linda Tweeten, Mary Ellen Nelson, Floy Petersen, Tim Smith and Jeff Eivins, about Smith's attitude and rude behavior towards employees on the 800 and 830 lines. Tweeten complained that Smith slammed the door to the Pentrex booth in her face.

On March 22, 1999, Michael Bush, Neal Tendall, Jodi Braun, Tom Swisher and Erin Schreck held a formal counseling meeting with Smith concerning her rude behavior toward coworkers. Swisher told Smith that three instances of interpersonal conflicts had been reported to him since March 18, 1999:

1) an incident on Thursday night when she reportedly went up to other associates (a male and female coworker) and said "why do I see you talking to your bitch girlfriend everytime I am around."

2) not informing her teammates of quality issues she discovered while auditing on Thursday night. (reportedly because she was upset about something).

3) becoming openly hostile with her facilitator Jodi Braun by throwing papers at/towards her on Friday night and slamming the Pentrex booth door.

Internal Correspondence at 1, Defendant's Ex. 1–F, App. 11. Bush informed Smith that, in the prior year and one-half, approximately fifteen interpersonal conflicts Smith had with co-workers and management had been documented in her personnel file. Bush informed Smith that "any further instances of any kind of interpersonal conflict, disrespect of management personnel (confrontational behavior), or

withholding of important quality information to her co-workers) would result in her no longer working at the Eaton–Belmond Plant." Internal Correspondence at 2, Defendant's Ex. 1–F, App. 12. Tendall reiterated that this would be Smith's final chance. Braun told Smith that she didn't want the meeting to discourage her from coming to her or Swisher if she had legitimate concerns.

On March 31, 1999, Jodi Braun received several complaints regarding Smith's confrontational behavior toward co-workers. It was reported that Smith approached Jeff Eivins in a hostile manner and shouted, "What the hell is going on with the blends?" After Eivins asked Smith not to speak to him in such a manner, Smith stormed off in mid-sentence.

On April 6, 1999, Michael Bush, Jodi Braun, Tom Swisher, and Neal Tendall met with Smith to discuss the results of Bush's investigation into complaints from Jeff Eivins and Smith about each other's behavior. Smith had alleged that Eivins had "harassed" her and Eivins had alleged that Smith had initiated a hostile confrontation. Bush informed Smith that, after interviewing a number of witnesses as well as Eivins, his investigation revealed that she had initiated the conversation with Eivins about her prior counseling at the work place and that she had been confrontational. Bush and Tendall told Smith that the conflicts and confrontational behavior that was occurring was affecting the entire 800 line and having a detrimental affect on business. Bush and Tendall told Smith that this was her final chance and that she had to change her demeanor and focus on good interpersonal skills.

In her performance review at the end of April 1999, Jodi Braun gave Smith a grade of "competent" in the category of cooperation and teamwork. Braun noted a recent improvement in Smith's attitude: "Over the last four weeks I have seen a great improvement in Nikki's cooperation & teamwork. She is helping others out & communicating well with all her teammates." Performance Review at 5, App. 154.

By the first week of May 1999, Smith was again refusing to speak with co-worker Jeff Eivins concerning her audit findings and would only relay information to him through co-workers. On May 20, Tim Smith reported to Tom Swisher that Smith had displayed hostile behavior toward him, refusing to authorize his quality set-up and walking away from him whenever he approached her with quality concerns. Jodi Braun also received complaints about Smith's behavior and was told that Smith had dropped a pan of valves and walked away without informing anyone about whether or not she had found quality control problems with the valves. Michael Bush received complaints from six employees about Smith's negative attitude and failure to comply with quality control measures.

On May 21, 1999, Michael Bush, Neal Tendall, Jodi Braun, and Tom Swisher scheduled a final meeting with Smith. Bush told Smith about several instances of her actions in the workplace that had been reported since May 19, 1999, including: 1) Smith's failure to communicate the fact that a production machine that had produced a bevel tip had been approved to resume production, resulting in the machine being down seven hours; 2) complaints from five of her co-workers about Smith's treating Mary Ellen Nelson in an angry, hostile and very rude manner during a team meeting on May 19th; 3) complaints from six co-workers about how she had handled a problem with a heat crack found on a part; 4) complaints that Smith had dropped a pan of tested valves on the floor and left them lying there for approximately one and one-half hours and failing

to report the results of the tests on the valves to team members; 5) complaints about Smith spreading false information or rumors about Floy Peterson and how these actions had proved disruptive to the work place. Smith denied some of the accusations but admitted others. Smith was told that her employment was being terminated due to her continuing attitude problems and failure to follow proper plant procedures. Smith's employment with Eaton ended on May 21, 1999. A female co-worker assumed Smith's duties after her termination.

Tim Smith and Jeff Eivins were Smith's co-workers. Neither Tim Smith nor Eivins ever supervised Smith. Eivins and Smith were personal friends. Tim Smith never sexually harassed Smith. Eivins told Smith that she had a "nice butt" on several occasions. Smith never complained to Eivins about his statement nor did she tell him she was offended by the statement. On another occasion Eivins told Smith on his birthday that: "Hey, it's my birthday today, are you going to be nice to me?" and "What are you going to give me?" Smith never reported Eivins's statements to management. Eivins and Tim Smith remain employed by Eaton.

After Smith was fired, she requested a copy of her employment file. A copy was provided to her but Eaton did not provide Smith with documents that were not contained in her personnel file, such as documents stored in the file of her supervisors Tom Swisher and Jodi Braun. The copy of the May 21, 1999, memorandum contained in Smith's file did not have the signatures of all the persons who were in attendance at that meeting. When Michael Bush noticed that the document had not been signed by everyone in attendance, he had asked those managers who had not signed the memorandum to do so.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact*

*and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### 2. *The parties' burdens*

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required

under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

### 3. *Summary judgment in employment discrimination cases*

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford* ); *Helfter v. United Par-*

cel Serv., Inc., 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson*, 931 F.2d at 1244); *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford*, 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow*, 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford*); *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford*, 37 F.3d at 1341); *Wooten v. Farmland Foods*, 58

F.3d 382, 385 (8th Cir.1995) (quoting *Crawford*, 37 F.3d at 1341); *Johnson*, 931 F.2d at 1244.

■ However, not long ago, the Eighth Circuit Court of Appeals also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citing *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). More recently, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves*, 530 U.S. at 142 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[1] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination

---

1. In *Reeves*, the Supreme Court was considering a motion for judgment as a matter of law *after* a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the

inquiry under each is the same.' " *Id.* at 150, 120 S.Ct. at 2110 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097 (emphasis added).

■ The court will apply these standards to Eaton's motion for summary judgment, taking each of Smith's claims in turn.[2]

### B. Claims of Sexual Discrimination

### 1. Disparate treatment claim

■ Smith contends that Eaton discriminated against her because of her sex in violation of 42 U.S.C. § 2000e *et seq.* The United States Supreme Court recognizes two theories to prove employment discrimination under Title VII of the Civil Rights Act of 1991. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). One is the disparate treatment theory, and the other is the disparate impact theory. *Id.* Here, Smith has only asserted the former. The United States Supreme Court defined disparate treatment in *International Bhd. of Teamsters:*

"Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some

situations be inferred from the mere fact of differences in treatment. . . .

*Id.* at 335 n. 15, 97 S.Ct. 1843.

■ There are two methods by which a plaintiff can attempt to prove intentional employment discrimination. First, the plaintiff can rely upon the standard set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), if the plaintiff produces direct evidence that an illegitimate criterion, such as gender, "played a motivating part in [the] employment decision." *Id.* at 258, 109 S.Ct. 1775. Once the plaintiff establishes such direct evidence, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have reached the same employment decision absent any discrimination. *Id.* If the employer fails to meet this standard, the employee prevails. Alternatively, the plaintiff can proceed under the three-stage, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Com. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once a *prima facie* case is established, a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee. If the employer articulates such a reason, the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination. Here, plaintiff Smith does not assert that she has direct evidence that

2. Iowa courts look to Title VII, its regulatory interpretations, and its case law in resolving sex discrimination claims and retaliation claims under the ICRA. *See Vivian v. Madison,* 601 N.W.2d 872 (Iowa 1999); *Hulme v. Barrett,* 449 N.W.2d 629, 631 (Iowa 1989);

*King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983). Therefore, while the court's analysis will refer only to Title VII, it also applies to Smith's sex discrimination and retaliation claims under the ICRA.

sex was a motivating factor in Eaton's decision to terminate her. Therefore, the court turns to the three-stage, burden-shifting standard set forth in *McDonnell Douglas.*

■ Under the *McDonnell Douglas* analysis, the plaintiff's usual burden to establish a *prima facie* case of employment discrimination is to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job he or she was performing; (3) the plaintiff suffered adverse employment action, or was discharged; and (4) a nonmember of the protected class replaced the plaintiff or was not subjected to the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

The United States Supreme Court clarified the burden-shifting analysis required for discrimination claims in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In Reeves, the court explained the burden-shifting analysis as follows:

McDonnell Douglas and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, the plaintiff must establish a prima facie case of discrimination. *Ibid.; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). . . . [Once the prima facie case is established,] [t]he burden . . . shift[s] to [the defendant] to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine, supra,* at 254, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. This burden is one of production, not persuasion; it "can involve no credibility assessment."

*St. Mary's Honor Center, supra,* at 509, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. [A defendant meets] this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired [for a legitimate reason]. Accordingly, "the McDonnell Douglas framework—with its presumptions and burdens"—disappear [s], *St. Mary's Honor Center, supra,* at 510, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, and the sole remaining issue [i]s "discrimination vel non," [*U.S. Postal Service Bd. of Governors v.] Aikens,* 460 U.S. [711,] 714, 103 S.Ct. 1478, 75 L.Ed.2d 403. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S., at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.; see also St. Mary's Honor Center, supra,* at 507–508, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra,* at 256, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *St. Mary's Honor Center, supra,* at 511, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d

407, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," *Burdine,* supra, at 255, n. 10, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

*Reeves,* 530 U.S. at 141, 120 S.Ct. 2097.

■ The court will assume, *arguendo,* that Smith has established a *prima facie* case of discrimination: she is female; she was capable of performing her job; she was fired, and male co-workers were not subjected to adverse employment action. Second, the court finds that Eaton has met its burden of producing sufficient evidence of a legitimate, non-discriminatory reason for firing Smith, based on her numerous violations of company policy and her confrontational behavior toward co-workers. Thus, at the third-stage, Smith assumes the burden of producing evidence that the proffered reason was merely a pretext for discrimination. *See Reeves,* 530 U.S. at 143–44, 120 S.Ct. 2097; *Williams v. St. Lukes'–Shawnee–Mission Health System, Inc.,* 276 F.3d 1057, 1058–59 (8th Cir.2002). Thus, the issue here is whether Smith can produce evidence that could lead a reasonable jury to believe that her termination was not really due to the violations of company policy, as Eaton contends, but was instead due to her gender.

■ As evidence of pretext, Smith argues that she was treated more harshly than male employees who committed similar infractions of company policies, and that a reasonable jury could infer that the differential treatment was due to her sex. While instances of disparate treatment may support an inference of pretext, to prove disparate treatment, the plaintiff must show that he or she was "similarly situated in all relevant respects" to a non-member of the protected class who was more favorably treated. *Cronquist v. City*

*of Minneapolis,* 237 F.3d 920, 927 (8th Cir.2001); *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994); *Lanear v. Safeway Grocery,* 843 F.2d 298, 300 (8th Cir.1988) (citing *Smith v. Monsanto Chem. Co.,* 770 F.2d 719, 722 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986)). In order to determine whether a plaintiff has shown that the employees involved were "similarly situated," the court considers whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Cronquist,* 237 F.3d at 927; *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1309 (8th Cir. 1994); *Boner v. Board of Comm'rs of Little Rock Mun. Water Works,* 674 F.2d 693, 697 (8th Cir.1982). It is not up to the employer to prove dissimilarity. *Lanear,* 843 F.2d at 301 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1254 (8th Cir. 1981). "The test for whether employees are similarly situated to warrant a comparison to the plaintiff is 'rigorous.'" *Cronquist,* 237 F.3d at 927 (quoting *Harvey,* 38 F.3d at 972).

The court finds that Smith has failed to demonstrate that she is similarly situated to either Jeff Eivins or Tim Smith. First, Eivins and Tim Smith did not perform the same job as Smith. Both Eivins and Smith were machine operators while Smith held the position of visual-pack auditor. More importantly, Smith cannot show that either Tim Smith or Eivins were the subject of multiple and continued complaints from their fellow co-workers which required multiple formal counseling sessions by management. Smith also does not point to any evidence in the record that either Eivins or Tim Smith had ever engaged in conduct of "comparable seriousness" to Smith's or that they had ever been subject to a formal counseling session in which they had been given one final

chance to improve their conduct. Thus, the court concludes that because Smith has failed to demonstrate that she is similarly situated to Eivins or Tim Smith, her assertion of disparate treatment fails because Smith has been unable to produce evidence that Eaton's proffered reason for her firing was merely a pretext for discrimination. Therefore, this portion of defendant Eaton's Motion For Summary Judgment is granted.

### 2. Hostile work environment claim

■ Smith has also asserted a claim of sexual harassment based upon a hostile work environment. The five elements of a hostile work environment claim are that: (a) she is a member in a protected group; (b) she was subject to unwelcome sexual harassment; (c) the harassment was based on sex; (d) the harassment affected a term, condition, or privilege of employment; and (e) the employer knew or should have known of the harassment and failed to take proper remedial action.

*Stuart v. General Motors Corp.,* 217 F.3d 621, 631 (8th Cir.2000); *accord Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000) ("(1) [the plaintiff] is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; and (4) the harassment was sufficiently severe or pervasive as to alter a term, condition, or privilege of employment."); *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir. 1999)("that (1) he is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and his protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take prompt and effective remedial action."); *Scusa v. Nestle U.S.A., Co.,* 181 F.3d 958, 965 (8th Cir.1999) ("that (a)

she belongs to a protected group; (b) that she was subject to unwelcome sexual harassment; (c) that the harassment was based on sex; (d) that the harassment affected a term, condition, or privilege of employment; and (e) that the employer knew or should have known of the harassment and failed to take proper remedial action."); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) ("To prove that she was subjected to a hostile work environment in violation of Title VII, [plaintiff] had to show that: '(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [defendants] knew or should have known of the harassment and failed to take proper remedial action.' ") (quoting *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993)); *Bales v. Wal–Mart Stores, Inc.,* 143 F.3d 1103, 1106 (8th Cir. 1998) ("There are five elements that [plaintiff] was required to prove to prevail on her claim: that she was a member of a protected group, that she was subjected to unwelcome harassment in the workplace, that the harassment was based on sex, that the harassment affected a 'term, condition, or privilege of employment,' and that [defendant] "knew or should have known" of the harassment and failed to take proper remedial action.' ") (quoting *Todd v. Ortho Biotech, Inc.,* 138 F.3d 733, 736 (8th Cir.1998)); *Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996) (" '(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [her employer] knew or should have known of the harassment and failed to take proper remedial action.' ") (quoting *Kopp,* 13 F.3d at 269)).

The United States Supreme Court has instructed that in order for a work environment to be sufficiently hostile to be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). When determining whether the alleged conduct rises to an actionable level, a court must examine "the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001) (quoting *Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275 (quotations and citation omitted)); *see also Stuart v. General Motors Corp.,* 217 F.3d 621, 631 (8th Cir.2000) ("To be actionable, a 'sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' ") (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275). The standards for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.' " *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275 (citation omitted). Thus, the Supreme Court has instructed that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Breeden,* 532 U.S. 268, 121 S.Ct. at 1510 (2001) (quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (quotations and citation omitted)).

Keeping these requirements in mind, the court turns its attention to consideration of Eaton's assertion that Smith cannot establish a hostile work environment sexual discrimination claim because the alleged incidents recounted above do not rise to an actionable level. As the Court in *Breeden* observed: " 'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' " *Breeden,* 532 U.S. 268, 121 S.Ct. at 1510 (quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275) (some internal quotation marks omitted). This is precisely what one finds in this case, with Eivins's sophomoric comments about a part his friend and co-worker's anatomy. Considering all the facts and circumstances surrounding Smith's claim of sexual harassment, the court concludes that no reasonable person could find them "severely hostile or abusive." Indeed, Smith never told her friend Eivins or any of her superiors at Eaton that she found his comments inappropriate. Smith's case is similar to several cases where courts have held the harassment was not actionable. *See Adusumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir.1998) (holding the complained of harassment non-actionable where plaintiff alleged that her co-workers subjected her to sexual harassment by their crude comments, including telling her she might be mistaken for a prostitute and making suggestive remarks about bananas, rubber bands, and low neck tops); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) (holding that plaintiff had not established a case of sexual harassment where her male supervisor referred to her as a "pretty girl" and a "tilly," made grunting noises when she wore a leather

skirt, remarked that his office became very hot when she entered, suggested that the two should go dancing at a nightclub and that the plaintiff should "run around naked," commented about his sex life, and made gestures suggesting masturbation). The court concludes that the isolated instances of conduct by Eivins of which Smith complains did not create a work environment so hostile as to constitute a change in the terms and conditions of employment, as required by *Breeden.*

 Alternatively, the court concludes that Smith's claim fails because Eaton had insufficient notice (actual or constructive) of the alleged hostile environment to which Smith was subjected. *See Hubbard v. United Parcel Serv.,* 200 F.3d 556, 558 (8th Cir.2000) (" 'Sexual harassment by a co-employee is not a violation of Title VII unless the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action.' ") (quoting *Barrett v. Omaha National Bank,* 726 F.2d 424, 427–28 (8th Cir.1984)); *Burns v. McGregor Elec. Indus., Inc.,* 989 F.2d 959, 966 (8th Cir.1993) (same); *see also Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 464 (7th Cir.1990) (holding that "sexual harassment by a co-employee is not a violation of Title VII unless the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action."); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–20 (6th Cir.1986) (holding that plaintiff must prove "that the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action"), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). It is uncontested that Smith never reported to her supervisors the statements made by Eivins. Nor is there evidence in the record that Eivins's statements were so pervasive that Eaton had constructive notice of his actions. Therefore, this portion of defendant Eaton's Motion For Summary Judgment is also granted.

### C. Retaliation Claim

Eaton next contends that it is entitled to summary judgment on Smith's Title VII retaliation claim. Under the sexual discrimination provisions of Title VII, 42 U.S.C. § 2000e–3(a), an employer is forbidden to retaliate against employees for opposing sexual discrimination.[3] *Bogren v. Minnesota,* 236 F.3d 399, 407 (8th Cir. 2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Ogden v. Wax Works,* 214 F.3d 999, 1007 (8th Cir. 2000). That section of Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's opposition to an employment practice made unlawful under Title VII or because of the employee's participation in an investigation, proceeding, or hearing under Title VII. Some courts have distinguished between the activities protected by the two clauses of 42 U.S.C. § 2000e–3(a). *See Robinson v. S.E. Pa. Transp. Auth., Red Arrow,* 982 F.2d 892, 896 n. 4 (3d Cir.

---

**3.** Section 2000e–3(a) provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to dis-

criminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

1993). The "opposition clause" prohibits retaliation because the employee "opposed any practice made an unlawful employment practice by [Title VII]," while the "participation clause" prohibits retaliation because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* (citing *Holden v. Owens–Illinois, Inc.*, 793 F.2d 745, 748–53 (6th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986)). Here, Smith has brought an "opposition" claim, grounded on her opposition to conduct in Eaton's Belmond plant that she believed was in violation of Title VII.

As the Eighth Circuit Court of Appeals has explained, " 'To establish a prima facie case of Title VII retaliation, [the plaintiff] must show: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection [existed] between her protected activity and the adverse employment action.' " *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir.2001). (quoting *Bogren v. Minnesota*, 236 F.3d 399, 407 (8th Cir. 2000)); *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713–14 (8th Cir.2000). Once this *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and, if the employer meets that burden, the presumption of retaliation disappears. *Buettner*, 216 F.3d at 713–14; *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 817–18 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1244 (8th Cir.1998) (citing *Jackson v. Delta Special Sch. Dist. No. 2*, 86 F.3d 1489, 1494 (8th Cir.1996)); *Harris v. Secretary, U.S. Dep't of the Army*, 119 F.3d 1313, 1318 (8th Cir.1997); *Moschetti v. Chicago, Central & Pacific R. Co.*, 119 F.3d 707, 709 (8th Cir.1997); *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997). The fact finder is then "left to determine if [the employee] presented evidence capable of proving that the [employer's] proffered reasons for termination were a pretext for illegal retaliation." *Harris*, 119 F.3d at 1318; *accord Moschetti*, 119 F.3d at 709; *Montandon*, 116 F.3d at 359.

Eaton seeks summary judgment on Smith's retaliation claim based on Smith's inability to establish her *prima facie* case of retaliation. Eaton contends that Smith cannot demonstrate that she engaged in protected activity. Smith contends that she complained to her employer about sexual harassment and that this constitutes protected activity. Smith further asserts that a causal nexus between her complaining of harassment and her termination can be established based on the fact that on April 6, 1999, she and Bush discussed her complaint about Eivins's commenting about her prior counseling. She points out that her employment was then terminated the next month, on May 30, 1999. She argues that because of the lack of any meaningful investigation into her complaint when combined with a lack of any indication in Eivins's file that a complaint had been made against him "a reasonable factfinder could draw the inference that Nicole's complaint was a determinative factor in her termination." Plaintiff's Brief at p. 13. The court will first consider Eaton's assertion that Smith cannot establish that she engaged in protected activity.

To prove that she engaged in protected activity, Smith need not establish that the conduct she opposed was in fact discriminatory. A plaintiff "must only demonstrate a good faith, reasonable belief that the underlying challenged action violated the law." *Buettner*, 216 F.3d at 714; *accord Little v. Windermere Relocation, Inc.*, 265 F.3d 903, 913 (9th Cir.2001); *McMenemy v. City of Rochester*, 241 F.3d

279, 285 (2d Cir.2001). What Smith complained about was Eivins commenting on her prior counseling sessions. Significantly, Smith did not complain about Eivins's statements to her that she had a "nice butt" or report the inquiry he made to her on his birthday. The court concludes that Smith cannot demonstrate a good faith, reasonable belief that Eivins's comments to her about her prior counseling session with her supervisors violated Title VII. Smith's "allegations cannot be without legal foundation, but must concern 'the type of activity that, under some circumstances, supports a charge of sexual harassment.'" *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 224 F.3d 701, 706 (7th Cir.2000) (quoting *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989)). Thus, "[i]f a plaintiff opposed conduct that was not proscribed by Title VII, no matter how frequent or severe, then his sincere belief that he opposed an unlawful practice cannot be reasonable." *Hamner,* 224 F.3d at 706. Here, Eivins's comments to Smith about her prior counseling session did not violate Title VII and therefore could not form the basis for a retaliation claim. *See Bogren,* 236 F.3d at 407 (holding that plaintiff did not engage in activity protected by Title VII where plaintiff complained to the investigator about harassing conduct that was directed at both male and female cadets); *Hamner,* 224 F.3d at 706 (holding that where plaintiff only alleged harassment based on his homosexuality, the conduct complained of was not proscribed by Title VII because Title VII does not prohibit employers from harassing employees because of their sexual orientation and, therefore, that "no reasonable jury could find that [Plaintiff] reasonably believed that his grievance was directed at an unlawful employment practice under Title VII."); *Wimmer v. Suffolk County Police Dep't.,* 176 F.3d 125, 135 (2d Cir.1999) (plaintiff's complaint of retaliation for opposing discrimination by co-employees against non-employees is not cognizable under Title VII because the statute only prohibits discrimination by employers, not co-employees, and thus plaintiff's opposition was not directed at an unlawful employment practice).

Moreover, Smith has not shown a causal connection between the alleged protected activity and her employment termination. Under the uncontested facts, Smith's job was in jeopardy before she engaged in the alleged protected activity. There is nothing in the record which shows that her complaint about Eivins motivated Smith's supervisors to terminate her. Rather, at the end of the April 6, 1999, session, Smith was told that she was to be given one final chance to change her behavior. It was only after further complaints were received from several sources about Smith's actions that she was terminated on May 21, 1999. Therefore, this portion of defendant Eaton's Motion For Summary Judgment is also granted.

### III. CONCLUSION

The court initially concludes that Eaton is entitled to summary judgment on Smith's claims of disparate treatment under Title VII and the ICRA because Smith has been unable to produce evidence that Eaton's proffered reason for her termination was merely a pretext for discrimination. The court also concludes that Eaton is entitled to summary judgment on Smith's hostile work environment claims under Title VII and the ICRA because the incidents of conduct identified by Smith do not create a work environment so hostile as to constitute a change in the terms and conditions of employment. Finally, the court concludes that Eaton is entitled to summary judgment on Smith's retaliation claims under Title VII and the ICRA be-

cause Smith cannot establish that she engaged in protected activity.

**IT IS SO ORDERED.**